Good morning, Your Honors. My name is Charles Weatherly, and I represent the Las Virgenes Unified School District in this matter. Your Honors, as you know, the matter before you today involves an order on remand from another panel of this Court, which had reversed the District Court's prior order in its predetermination finding. The matter came back to, went back down to the District Court. The District Court ignored, in our view, the remand order of the panel, based its decision on the same historical evidence that had been found. Well, Mr. Weatherly, I know you said that in your brief, and it strikes me that that's not entirely accurate. Certainly, the District Court did repeat or recite the core findings that she had made in Round 1, but she held an evidentiary hearing on remand and heard testimony from, I believe it was three representatives of the school district, and from the child's mother. And she said that she disbelieved the testimony of the school district representatives, that they, in fact, had an open mind. And she credited the testimony of the child's mother that she was quiet because of futility. Therefore, the district judge found that the decision was pre, was, had been made before the meeting, and therefore, under the law that we established on. The first time was predetermined. So why doesn't that kind of end it? Well, Your Honor, I think for a number of reasons, which I guess that is, let me see if I can condense these quickly, because that's probably, I know I've briefed it, it's probably the bulk of the argument. But the difficulty that we have with the analysis of the approach of the District Court, Your Honor, is the District Court was not instructed to ignore the law of this circuit, the very clear law. Well, we set the law of the circuit. In effect, we set the law of the case, if not the circuit. Sorry, we didn't publish. The law of the case in the footnote in the memorandum disposition, whether that's right, wrong, or different, that was the law by which the District Court was bound on remand. Well, Your Honor, I acknowledge and agree that the language of the Court's order was very clear, that the District Court was to consider whether or not the district was willing to consider alternatives in light of problems or difficulties that might be present. And that was the express language of the order that is never addressed by the District Court in its order. There's not one scintilla of evidence that there was any fact that would indicate that there was anything that would be harmful to H.B. But isn't it what the District Court was supposed to look at? It was the prong of whether the predetermination test of whether the school district was unwilling to consider any other alternatives, particularly Elliott. Unwilling to consider in light of any difficulties or problems that might exist. I don't understand why you're adding that qualification. Well, all right, Your Honor. Let me explain. In our view, if we are briefed, and I didn't mean to get too much into the brief, Your Honors, the very clear mandate is to assume and presume a public school placement. That's part of the continuum of alternative placements from general education down to hospitals and institutions. What you look at as you move along the continuum, starting always at the general education classroom, is you consider those problems and difficulties that might exist that would preclude the child from being placed in the less restrictive setting. I guess that's the crux of it, isn't it? That, as I understand how the school district is supposed to do in terms of considerations of placement, that the goal of IDEA is to give the child a fair and appropriate education in a normal public school environment if possible. But then what the district also needs to consider is whether the particular needs of the child preclude that. And it seemed that there, what Judge Peeble was saying was that the district was not ever really willing to, they said that's the priority and stuck to that priority, and they didn't really consider how well HB was doing at Elliott, what Elliott provided to him in particular, and they just weren't willing to consider that. They were going to do the public school placement no matter what from the outset of the IUP. Well, yes, Your Honor. Let me respond in two ways. One, let me say first, the Supreme Court in the Anderson case cited by Duplankis in this case make it very clear that the district court cannot hide behind its credibility findings, because what you have to look at is what are the facts. Now, you know, responding to Your Honor's question, we submit that whether you're willing is a question of whether you're willing under the language of the panel in light of problems or difficulties. You do assessments, and let me step back to the August 03 IEP meeting for a moment. At that IEP meeting, which they make much of as part of the drumbeat, there was clear discussion at that meeting of the concerns that were in the notes that the district court makes reference to. Those concerns were, one, that he would regress if he were returned to a school district program, and part of that regression being that he would return to the behaviors that he had exhibited before he was placed in Elliott by the school district and funded by the school district two years prior. Now, at that meeting, Your Honors, it was discussed, those concerns of the parent were discussed. They were discussed by Dr. B.J. Freeman. My problem is that's where we were two or three years, two years ago. I mean, I'm sitting here saying I've heard this before. This is exactly what was argued last time. And right, wrong, or indifferent, the panel said, look, what we need is a fact-finding on the district's intent and state of mind coming into that meeting. That's what we need. We're past all that. Well, Your Honor, I don't, with all due respect. Yeah, I know. I mean, the problem is I was on the panel. No, no, I was. And part of the disposition. I mean, we're just, I don't see how we're not past that. If I might. Yeah. The point of the motivation or intent on the remand instruction did not, and there was nothing about this, the panel's decision, that obviated the need for the district court to consider whether or not that procedural violation significantly or seriously impaired the rights of input by the parent. I mean, the decisions of this circuit are so clear, W.G., Amanda J., all of the cases, Shapiro, L.M., on and on and on. You must have facts of serious infringement. The district court never does that. All the district court really does is say, okay, here's this evidence of drumbeat. Here's this evidence of the district following its legal mandate, we submit. I believed in 2005 that that was a sufficient evidence of predetermination. Now, district, you show me why I was wrong in that. Where do you see that in the judge's ruling? I mean, you're basically saying that the district judge did what the plaintiffs accused the school district of, predetermined it. It wasn't anything that I saw in the prior remand order from this Court that precluded Judge Cooper from relying on evidence that had been submitted the first time around. No, I don't mean that, Your Honor. I don't mean that the judge precluded. All I'm saying is that if you look at the order, it's our position that the judge, by quoting four pages from the previous order, which contained infirm legal principles, and when you apply infirm legal principles to the facts, you've committed error. You don't have a comparative analysis. But do you think, are you arguing now that it's infirm because it conflicts with that Seventh Circuit case in Hortsman, our law on predetermination, or at least the law of the case that we're having to apply here on predetermination is not, is in conflict with possibly some of the other circuit law? Well, Your Honor, I don't, and I should have addressed this. I don't agree that there is a law of the case, and that is certainly not a controlling principle. That's discretionary, as Your Honors know. I mean, the very case that's cited by the plaintiffs in this case, that's a discretionary doctrine. It's not binding. And when this court says, we remand for you to look at, as part of the predetermination analysis, were you willing to consider, again, in light of the difficulties, means to me, it's sort of, with a vantage eye, were there facts? Were there self-injurious behaviors? Was there aggression? Was there something that was going on that was never brought to the attention of the district? Or if brought to the attention of the district at the meeting, they declined to address it. And a parent, this would be terrible policy if a parent could just come to an IEP meeting and say absolutely nothing, remain silent, and then have a finding of predetermination. It's one of two. There's no question about that. But that's not, that's not, that's abstracting way away from what happened here. I mean, there was a long history. And the district judge to whom we entrusted the question said she believed the mother's testimony that it was futile. I mean, and the judge bought that, that it was futile. Well, there is no, there is no futile, and I want to reserve two or three minutes, Your Honors. But there is a futility exception. They must establish facts to support futility. And again, there were no facts other than the drumbeat evidence, which this panel rejected as sufficient in and of itself. So the drumbeat facts support their predetermination argument, and the drumbeat facts support the argument of futility. I don't see how you say that the prior decision rejected the drumbeat evidence. It's basically what the prior decision said is that there needs to be findings about intent. And so the judge took the prior evidence, took the evidence that she heard from the three witnesses or however many it was, and then she made a finding about intent. I mean, that's classic, that's classic, you know, what district judges do and what she was told to do. Well, the reason it was is this court went through in the paragraph preceding the remand instruction paragraph, went through the drumbeat evidence and said this alone does not necessarily provide anything. And that's the language of the Ninth Circuit's opinion, does not necessarily, all it establishes is a plan. And this is what the district was going to do consistent with the mandate. And I don't know what to do about it. Consistent with that mandate, Your Honor. And so we believe that that decision was very clear that those facts did not establish predetermination, nor do they establish futility. Okay. Mr. Weatherly, Mr. Crook. Thank you, Your Honor. Good morning, Your Honors. I'm George Crook. I represent the HB family. May it please the Court. This is a single-issue case. There was a very clear remand order. Judge Cooper was to make a very specific finding. She did that. She did it after an evidentiary hearing in which she looked at four witnesses, observed them under oath, listened to their voices, listened to the inflections, saw their reactions to questions, weighed their testimony, and decided who was correct and who wasn't. That's a classic finding of fact by a district court judge. It's entitled to great deference. It can only be reversed if this Court is left with an abiding conviction that Judge Cooper, hearing those people in her courtroom, made a mistake. And a credibility determination is presumed to be correct. There's nothing in the record to rebut Judge Cooper's credibility determinations. And, as we briefed, there's a lot in the record to support them. There is no ñ in our view, there's no real possibility that she should be reversed. With respect to the law of the case, it certainly was not discretionary for Judge Cooper. Judge Cooper was confined to this Court's order, the remand panel's order, at the very end of its decision. The case was to go back to the district court. The district court was to make a determination of whether the district was willing to consider anything the parents might have brought up or would have brought up. And there was no requirement that the parents had to have evidence that they really had brought something up. The remand panel knew very well what had happened at that IEP meeting. The remand panel had that record. The remand panel knew that at the August 20, 2003, IEP meeting, the parents had been crystal clear about their concerns with the district. And the remand panel knew that following that, the district tried to cause an assessment to take place. The remand panel knew the parents fought it and that that case was settled scarcely a month before the IEP meeting. The remand panel knew that on October 10, 2003, the district wrote a letter to the Elliott Institute saying, We're not paying anymore. You're on your own with this family. The remand panel knew the family had fought that and had gone to CEHO, the California State Education Hearing Office, and obtained a stay-put order. All of that was in the record. All of that was clear. And all that was needed was this specific finding, which Judge Cooper made. One of the cases that Mr. Weatherly relies on pretty heavily in this brief is the Seventh Circuit's case in the, I don't know how you pronounce it, Hortness. We'll just call it Hortness. Do you regard what Judge Cooper did, and I recognize that's not controlling authority here, obviously, but do you recognize what Judge, do you believe that what Judge Cooper did conflicts with that decision and why not? Because that decision recognizes that, although it attaches more weight to the least restrictive environment issue than I think it should have, it nevertheless doesn't rest its holding on that. It rests its holding on a finding that the district had not predetermined anything and that the family had pretty much filibustered at every IEP meeting. True, the district held the court that the school district had not gotten to every question imaginable at the IEP meeting, but also held the Seventh Circuit. That was because the parents would not let it. The parents, every time there was an IEP meeting, said, well, the only issue on the table here is whether our child may go to, may continue in X school, private school. And there's no indication anything like that in this case. Basically, that's the word. That's the distinction. That's correct. The district obviously had free reign with its IEP meeting. And, Your Honors, there's all the testimony in the record and all the evidence in the record about Ms. Schillinger's statement at the beginning of that IEP meeting. Well, and then we'll consider a transition, which became under oath before Judge Cooper. Do a transition, consider a transition, think about a transition, see if this child is ready for a transition, none of which was in the record, all of which the record contradicted, in fact. The least restrictive environment is a red herring in this case. Yes, there is a least restrictive environment requirement. And what is that? It is that a child will be educated in the least restrictive environment that is appropriate for the child. So that begs the question, what's appropriate for the child? That's a substantive question. Predetermination is a procedural violation, which means there has not been a fake. Stop thinking, says the case law in this circuit to Judge Cooper, as soon as you determine that there's been a substantial interference with a parent's right to participate in the IEP process. What could possibly be a greater interference with that right than for a school district to decide, irrespective of the merits of the matter, that a child was going to be placed in a district school no matter what? Okay, so if there's a procedural violation, then that wipes out the fake. Now what? The child stays at the state court location. They do it again. I mean, what happens next? Yes, essentially. I mean, there have been a lot of events after this decision, and we're charting the record. But, yes, assuming that H.B. were still at the Elliott Institute, which he now is, but it's sort of a circuitous route by which he's there now. But assuming there has been no change, H.B. had continued at the Elliott Institute, this case is decided in his favor, yes, it becomes a state court placement. And it's up to the district then, if it's motivated to do so, to hold an IEP meeting and to think through the matter and to decide what it believes is best for the child, take into account the parent's thoughts, wishes, difficulties, issues, et cetera, and then make another determination as to an appropriate placement for the child. The law mandates. It could be going. I know, but it sounds like this process could go on forever until the child graduates from school, because they'll hold another IEP. Clearly, the position of the school district, as found by Judge Cooper, is that he should transition back to the public school. So even if they held another IEP, I mean, it would be very unlikely that anybody would think if they came up with transitioning back to the public school district that that wasn't predetermined. That it was just a pristine decision that resulted in an IEP meeting the way the College of Cardinals is supposed to elect a pope, I suppose. How old is H.B. now? I believe he's 16, Your Honor. So there is an end to this litigation in sight. This is not John Dice. So unless the Court has any questions, I believe I've said what I have to say. I don't think so. Thank you, Mr. Court. Okay. Thank you, Your Honor. Mr. Weatherly.  I want to reemphasize. Maybe I was not clear enough. The difficulty here is the district court ignored its obligations under the law regarding findings of predetermination. That is a question of law, and the district court should have applied the harmless error standard and determined whether or not there was serious infringement on participation in the process. All the district court did in this case was say, I don't believe the witnesses, which under international brotherhood is not sufficient. There are no bases given for not believing the witnesses. Mr. Crook, in the brief and in the argument, likes to talk about tone and demeanor. The district judge makes no reference to tone and demeanor, makes no reference to conflicting evidence in the record, makes unsupported credibility findings. What do you mean by unsupported? I mean, one of the things Judge Cooper said is that I tend to believe what people did at the time rather than what they're saying about it several years later, which is a pretty reasonable way of looking at things. Well, I understand. That's support, isn't it? Well, Your Honor, I don't agree that it is. The transition plan discussion at the remand hearing was no different than the transition discussion at the IEP meeting, which is that as part of the legal mandate, we also have to discuss, as part of what our offer would be to get him in a less restrictive setting, we must discuss transition. And that was the discussion that occurred at the remand hearing. And I, you know, the district courts apparently misunderstood that because I've looked. I've looked at both, and they are entirely consistent, Your Honor. Thank you. Thank you. Thank you, Mr. Weatherly. Thank you, Mr. Crook, for the argument. The matter just argued will be submitted.
judges: Kennelly, Rymer, Wardlaw